**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
RAYMOND E. GOSSELIN,

                              Plaintiff,

                  - against -

SHEET METAL WORKERS' NATIONAL
PENSION FUND,

                          Defendant.
-----------------------------------------------------------X

                                        **REPORT AND**
                               **RECOMMENDATION**

                              CV 16-4391 (ADS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     <u>PRELIMINARY STATEMENT</u>

        Plaintiff Raymond Gosselin ("Plaintiff") commenced this action under the Employee

Retirement Income Security Act, 29 U.S.C. §§ 1132 *et seq*. ("ERISA"), challenging the

determination of the Sheet Metal Workers' National Pension Fund ("Defendant" or "the Fund")

which denied him certain retirement benefits to which he claims he is entitled.  *See generally*

Amended Complaint ("Am. Compl.") [DE 13].  Both Plaintiff and the Fund have moved for

summary judgment, and both motions have been referred by Judge Spatt to this Court for a

Report and Recommendation as to whether the motions should be granted.  *See* DE 46.  For the

reasons set forth below, the Court recommends to Judge Spatt that Plaintiff's motion for

summary judgment be DENIED and the Fund's motion for summary judgment be GRANTED.

II.     <u>BACKGROUND</u>

    A.     **The Asserted Material Facts**

        At the outset, the Court notes that both parties appear to misapprehend what constitutes

the "material facts" of this case.  While each side in its respective Rule 56.1 Statement attempts

to assert the disputed facts underlying the circumstances of Plaintiff's employment as "material," those facts are immaterial to the instant litigation.  What is material, rather, are the "facts" which were considered by the Fund and cited as the bases for its ultimate denial of Plaintiff's claim for retirement benefits.  As explained in greater detail below, in an ERISA appeal of this sort, "the district court sits in effect as an appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious," and its review is generally limited to the record which was considered by the pension fund.[1]  *Anderson v. Sotheby's, Inc.*, No. 04 CIV. 8180, 2006 WL 1722576, at *14 (S.D.N.Y. June 22, 2006) (quoting *Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp.,* 862 F. Supp. 783, 791 (E.D.N.Y. 1994)); *see Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("Most circuits have declared that, in reviewing decisions of plan fiduciaries under the arbitrary and capricious standard, district courts may consider only the evidence that the fiduciaries themselves considered . . . . We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record.").  Under this protocol, it follows that absent extraordinary circumstances, there will be no dispute of material facts because the administrative record is settled.  *Anderson*, 2006 WL 1722576, at *14 ("Where review is properly confined to the administrative record before the ERISA plan administrator . . . there are no disputed issues of fact for the court to resolve.").  For this reason, with certain limited exceptions, the Court limits its recitation below to those material facts from the parties' Rule 56.1 Statements which are properly considered "material" to this lawsuit – those which are part of and supported by the administrative record.

---

[1]    The case law in this Circuit has developed necessary caveats to this general rule, which are discussed below.

### 1.    *The Fund and the Plan*

The Fund is a multiemployer pension plan and Plaintiff is a participant in the Fund's defined benefit pension plan ("the Plan").  Defendant's Rule 56.1 Statement of Material Facts ("Def.'s SOMF") [DE 30-1] ¶¶ 1-2.  The Fund's Plan Document ("the Plan Document") gives the Fund's Board of Trustees the sole discretionary power and authority to determine, among other things, the application and interpretation of the Plan Document and the entitlement to or amount of any pension.  *Id*. ¶ 3; Plaintiff's Rule 56.1(b) Response to Defendant's Statement of Material Facts ("Pl.'s 56.1(b) Response") [DE 30-1] ¶ 3.  The Board of Trustees has delegated its power and authority to determine application and interpretation of the Plan Document to an Appeals Committee ("the Committee"), which, pursuant to Section 8.03(b) of the Plan Document, has the same discretionary power and authority as the Board of Trustees.  Def.'s SOMF ¶ 4; Pl.'s 56.1(b) Response ¶ 4.  Plaintiff also asserts several purportedly material facts regarding the Fund's financial solvency.  Specifically, Plaintiff states that as of March 2010, the Fund was in "critical" status, which the Fund does not dispute.  Pl.'s SOMF ¶ 13.  Plaintiff also asserts that in 2015, the Fund was in "endangered" status.  *Id*. ¶ 14.  The Fund disputes this, stating that the April 2015 Department of Labor Notice cited by Plaintiff is not part of the Administrative Record, and disputing that it "may be introduced as evidence in support of Plaintiff's Motion for Summary Judgment under the 'abuse of discretion' standard."  Def.'s 56.1(b) Response ¶ 14.

##### 2.    *Plaintiff's Application for Pension Benefits*

Plaintiff started working for Triple S Sheet Metal ("Triple S") in 1978.  Plaintiff's Rule 56.1 Statement of Material Fact ("Pl.'s SOMF") [DE 29-1] ¶ 1.  Plaintiff's Rule 56.1 Statement asserts that Triple S changed ownership in 1996, which the Fund states is not supported by the administrative record.  *See* Pl.'s SOMF ¶ 3; Def.'s 56.1(b) Response ¶ 3.  For purposes of clarity, the Court uses "Triple S" to refer to either Triple S Sheet Metal, or Triple S Air Systems Inc.

On June 9, 2014, Plaintiff sent a letter to the Fund indicating that he intended to retire as of January 31, 2015, shortly after his 55th birthday.  Def.'s SOMF ¶ 6.  In response, the Fund wrote to Plaintiff informing him that it could not accept his application for pension benefits more than six months in advance of his retirement.  In order to activate his pension for a February 1, 2015 effective date then, he would need to notify the Fund in writing no earlier than August 1, 2014.  *Id.* ¶¶ 7-8.  On September 8, 2014, the Fund received a second written request from Plaintiff for pension benefits beginning on February 1, 2015.  *Id.* ¶ 9.  In connection with his application for pension benefits, Plaintiff executed an Authorization to Obtain Earnings from the Social Security Administration ("SSA").  *Id.* ¶ 10.  On January 31, 2015, the SSA sent the Fund an itemized record of Plaintiff's earnings, which the Fund received on or about February 9, 2015.  Pl.'s SOMF ¶ 29; Defendant's Rule 56.1(b) Responses to Plaintiff's Statement of Material Fact ("Def.'s 56.1(b) Response") [DE 29-2] ¶ 29.

The Fund wrote a letter to Plaintiff on March 5, 2015  advising him that the SSA reported that he had earned income from a company named J & S Fabricators Inc. ("J & S") in years 2001, 2002, 2003, 2004, 2006, 2007, 2008, 2009, and 2010.  Pl.'s SOMF ¶ 30; Def.'s SOMF ¶ 12.  The letter requested that Plaintiff provide a description of the services provided by J & S, Plaintiff's job title and job description with respect to J & S, and J & S's union affiliation, if any.

*Id*. In an undated letter received by the Fund on or about April 6, 2015, Plaintiff responded by

stating as follows:

> In response to the earnings reported for J&S Fabrications; I received
> this money as bonuses for work done at Triple S Air Systems. There
> was no job description, job title, or union affiliation that I know of.
> I showed the letter you sent me to my employer, Steven Benkovsky
> of Triple S Air Systems, and asked him to explain to me why he paid
> me bonuses under J&S Fabrications. He did explain it and said this
> has come up before. Enclosed is a letter he composed with his
> explanation.

Pl.'s SOMF ¶ 31; Def.'s 56.1(b) Response ¶ 31. Plaintiff's response enclosed a letter dated

March 17, 2015 on "J & S Fabrication Inc." letterhead, which stated as follows:

> 80 Raynor Avenue
> Ronkonkoma, NY 11779
> Under dissolution
>
> March 17, 2015
>
> Re: J and S Fabricators, Inc. ("J and S")
>
> To Whom it May Concern:
>
> An inquiry as to the operations of the aforementioned entity has been
> raised. Please be advised of the following.
>
> This Company does not perform any work under a collective
> bargaining agreement. This Company was established at the time
> the principal acquired the assets of a different, unrelated company
> in the industry. The sole purpose of creating J and S at the time was
> for J and S to be the owner of the equipment purchased but which
> was not fully paid for. If the industry company was unsuccessful,
> the equipment could be returned to the seller without having to go
> through a bankruptcy foreclosure. As the industry company was a
> start-up operation, the seller was concerned about its possible
> failure, and the resulting claims by its creditors against those
> tangible assets. So in order to protect those tangible assets, J and S
> was created.
>
> J and S never performed services or any bargaining unit work for
> any customer. It was never engaged in bidding projects, securing
> projects, performing services for any outside customers in any

5

manner or purchasing materials on behalf of any entity. This Company ceased activities in 2010 and had incurred a payroll of only $2,425 for the year 2010.

As the years progressed and changes came to the industry, an idea was discussed to utilize J and S for the fabrication of spiral pipe. Upon analysis and review of the market, it was determined that the Company could not gain a competitive edge and become successful. Thus, the idea was abandoned. Later on, the possibility of using this entity as a startup for light commercial work for the local was explored. This endeavor was also scuttled due to the many restrictions imposed by the local. At this point, the idea has been abandoned.

As these ideas were considered, a bank account was created for J and S. From time to time, bonuses were paid to some employees for the industry company which came out of the J and S account. All hours worked were fully reported. However, no sheet metal work was done by J and S. At no time did J and S perform work relating to handling, manufacture, fabrication, installation, dismantlement, balancing and testing, alteration, repair or servicing of any sheet metal or substitute product. J and S filed a final corporate income tax return for the year ended December 31, 2014. Pursuant to New York State regulation, it is in the process of dissolution. It is expected that dissolution will be granted by April 30, 2015.

I trust that the above adequately addresses the inquiry. Any further questions will be addressed by the undersigned.

Very truly yours,

J and S Fabricators Inc.
Steven Benkovsky
Formally President of

Administrative Record, attached to Defendant's motion for summary judgment as Exhibits A-B

[DE 37-4 – 37-6] ("AR") at 032;[2] see Pl.'s SOMF ¶ 32; Def.'s 56.1(b) Response ¶ 32.

---

[2]   While the Court cites from the parties' Rule 56.1 Statements whenever possible, the Court here and in several other places cites directly to the Administrative Record for clarity.

### 3.     The Fund's Determination

On June 5, 2015, the Fund wrote to Plaintiff and informed him that his requested pension

benefits would be subject to early retirement delays, stating it had determined that, although

Triple S was signed to a collective bargaining agreement with the International Association of

Street Metal, Air, Rail and Transportation Workers ("the Union"), J & S was not signed to such a

collective bargaining agreement.  Def.'s SOMF ¶¶ 14-15.  The Fund's letter also stated that it

had verified with the Secretary of State of New York that as of the date of the letter, J & S was

still an active employer operating at the same location as Triple S, in a facility that described its

work as designing and fabricating sheet metal ductwork for HVAC systems.  *Id.* ¶ 17.  Plaintiff

disputes this underlying fact and asserts that J & S was actually in dissolution.  *See* Plaintiff's

Rule 56.1(b) Responses to Defendant's Statement of Material Fact ("Pl.'s 56.1(b) Response")

[DE 30-1] ¶ 17.  The letter stated its conclusions as follows:

> In consideration of this information, its the Fund's position that J &
> S Fabricators is doing work in the Sheet Metal Industry as it is doing
> work covered by collective bargaining agreements to which the
> Union and/or any Local are a party; is work under the trade
> jurisdiction of the Union, as that trade jurisdiction is described in the
> SMART's (formerly SMWIA) constitution; and is work to which a
> sheet metal worker has been assigned, referred, or can perform
> because of his skills and training as a sheet metal worker.  We have
> also confirmed that J & S Fabricators is not signed to a Union
> collective bargaining agreement.
>
> In light of this, you are ineligible for a 55/30 Pension in accordance
> with Plan Section 5.09 (d)(1) which provides that if a Participant or
> Employee, or former Participant or Employee, at any time after his
> Contribution Date performed or performs at least one (1) hour of
> employment on or after September 1, 1988 in the Sheet Metal
> Industry that is not covered by a collective bargaining agreement
> between the Union and the employer, the Participant will be
> ineligible for a 55/30 Pension.
>
> Additionally, we have determined that your pension is subject to
> early retirement delays as provided under Section 5.07(c) which

provides that if a Participant or Employee performs at least one (1) hour of employment on or after September 1, 1988 in the Sheet Metal Industry that is not covered by a collective bargaining agreement between the Union and the employer, the special early retirement date of said Participant or Employee, or former Participant or Employee will be delayed six (6) months.

Based on the present Fund records we have determined that you worked in this non-signatory capacity for a total of 36 quarters (108 months) resulting in a delay of 216 months.

AR at 035-36.  The letter also informed Plaintiff that notwithstanding the 216 month delay, he would be eligible for a normal Pension at age 65.  Def.'s SOMF ¶ 22; AR at 036.  Plaintiff was also advised in the letter that he had a right to appeal the Fund's determination to the Appeals Committee and that he had 180 days to do so.  Def.'s SOMF ¶ 23.  The letter also explained the standard Plaintiff would need to satisfy for a successful appeal and informed him of the rules governing a request for a delayed appeal submission.  *Id*. ¶¶ 24-25.

### 4.    *Plaintiff Appeals the Fund's Determination*

On or about November 5, 2015, Plaintiff submitted to the Fund a letter requesting an appeal of the Fund's decision.  Pl.'s SOMF ¶ 38.  That letter stated as follows:

Dear Debbie Elkins

I, Raymond E. Gosselin, am writing today because I believe that the Funds decision to make me ineligible for the 55/30 pension is in error.  I am appealing this decision. The only proof I have is a letter from my employer stating what he did.  This money was given to me in the form of "Christmas bonuses," not for work done.  I had no idea at the time why he used another company and did not care at that time, I do now.  I feel you are penalizing me for something that I really had no control over.  I excepted checks for doing a good job in the form of a year end bonus.  This is effecting my life in a really bad way.

Sincerely,

Raymond E. Gosselin

AR at 031.  With this November 15th letter, Plaintiff again submitted the March 17, 2015 letter

from Steven Benkovsky ("Benkovsky").  Pl.'s SOMF ¶ 39.  On or about November 16, 2015, the

Fund sent Plaintiff a letter confirming receipt of his appeal.  *Id*. ¶ 41.  The Fund's letter stated

that (1) Plaintiff's appeal would be presented to the Appeals Committee at the next meeting,

which was tentatively scheduled for December 2015, and (2) if Plaintiff had "any additional

information to include with [his] request" to "please submit it to the Fund Office by December 5,

2015."  *Id*.; AR at 033.

In early December 2015, Fund staff[3] prepared a briefing memorandum for the Appeals

Committee with respect to Plaintiff's appeal.  Def.'s SOMF ¶ 36.  The memorandum recited the

procedural history of Plaintiff's appeal, and concluded as follows:

> In review of the definition of the term "Sheet Metal Industry", and
> information found in [the] record, the Participant's employment
> with J & S Fabricators, Inc. is in the Sheet Metal Industry for the
> following reasons:
>
> A.    Within the purview of the SMART Constitution.
>
> B.    Work performed because of training and experience
>       as a sheet metal worker.
>
> Accordingly, the appellant is ineligible for a 55/30 Pension in
> accordance with Section 5.09(d)(1)[;] benefits the Participant earned
> on or after September 1, 1998 are subject to Early Retirement delays
> in accordance with Section 5.07(c)(1) of the Plan.

AR at 024; Pl.'s SOMF ¶ 42.

### *5.    The Committee's Determination*

On December 14, 2015, the Appeals Committee considered and denied Plaintiff's appeal.

Def.'s SOMF ¶ 37; Pl.'s SOMF ¶ 43.  The Committee notified Plaintiff of its decision in a letter

---

[3]  The memorandum states that it was prepared by Jessica Smith.  AR at 022.

dated December 19, 2015.  Def.'s SOMF ¶ 38; Pl.'s SOMF ¶ 44.  That letter stated, in relevant

part, as follows:

> The Committee reviewed the Fund Office's conclusion that your employment with J & S constituted employment in the Sheet Metal Industry . . . .
>
> The Committee considered the report of your earnings from the U.S. Social Security Administration ("SSA"), which showed that you had earnings [from Triple S. Air Systems and J & S Fabricators, Inc.].
>
> The Committee observed that Triple S Air Systems was a Contributing Employer to the Fund, and acknowledged that your employment with that Contributing Employer was not at issue. However, the Committee noted that J & S Fabricators was not a party to a collective bargaining agreement with the Union. The Committee considered your assertion that your earnings with J & S Fabricators were given to you in the form of Christmas bonuses and not for work done.  However, the Committee concluded that the SSA earnings report clearly showed that you received earned income from J & S Fabricators as an employee of J & S Fabricators, and it therefore rejected your assertion.
>
> For purposes of determining whether your employment with J & S Fabricators constituted employment in the Sheet Metal Industry, the Committee reviewed a D & B report and information from the Secretary of State of New York, which showed that [ ] J & S Fabricators is still an active entity and that it shares the same address and telephone number as Triple S Air Systems.  Given that J & S Fabricators shares the same address as Triple S Air Systems, the Committee also reviewed the information that the Fund Office found on the internet for the facility located at that address. Specifically, the Committee noted that the facility at that address is described as follows on http://www.triplesair.com/company_ frame. htm:
>
> > ... At this location we design and fabricate sheet metal duct work for HVAC systems according to the engineers design and specifications, which is then transported and installed by qualified tradesmen.  A project manager is assigned to every job, along with our field supervisor to insure proper and timely performance of every project.
>
> The Committee reviewed with the Fund's Office staff Plan Document Section 1.35 and the SMWIA's Constitution.  Given that J & S Fabricators shares the same facility as Triple S Air Systems,

and given the fact that the name incudes the term "Fabricators," the Committee found that J & S Fabricators conducts work covered by a collective bargaining agreements to which the Union and/or any Local are a party (or under the trade jurisdiction of the Union).

The Committee also reviewed correspondence dated March 17, 2015 from Steven Benkovsky (as the President of J & S) . . . .

The Committee observed that Mr. Benkovsky acknowledged that J & S was established to own equipment to be used by another company in the industry. The Committee interpreted this to mean that J & S owned equipment that was used in the industry (i.e., the Sheet Metal Industry), which is consistent with the fact that it is located at the same facility as Triple S Air Systems and has the word "Fabricators" in its name.

The Committee also noted that although you maintain that your income from J & S was the result of bonus checks paid and travel expenses paid on behalf of Triple S Air Systems, the earnings reported to the SSA show that you received earned income as an employee of J & S Fabricators. Further, the work you performed for Triple S Air Systems was covered by a collective bargaining agreement with the Union, and there is no contention that the payments made to you by J & S were made pursuant to triple Air Systems' collective bargaining agreement. The Committee observed that Mr. Benkovsky did not provide any explanation as to why a bonus check would be issued by J & S to an employee of another company.

Based on the foregoing, the Committee concluded that your employment with J & S Fabricators constituted employment in the Sheet Metal Industry, as defined in Section 1.35 of the Plan Document. Further, because your employment with J & S Fabricators was not covered by a collective bargaining agreement between the Union and J & S, the Committee concluded that such employment rendered you ineligible for a 55/30 Pension as provided in Plan Document Section 5.09, and also concluded that the benefits earned after August 31, 1988 are subject to the Special Early Retirement delays under Plan Document Section 5.07 (as well as Early Retirement Pension delays under Plan Document Sections 5.05(a) and 5.05(b)).

AR at 001-004.

### 6.    *Post-Appeal Correspondence*[4]

On or about March 8, 2016, the Fund received a letter from attorney William D. Frumkin, who stated that he had been retained by Plaintiff with respect to his application for pension benefits.  Def.'s SOMF ¶ 54; Pl.'s SOMF ¶ 45.  Mr. Frumkin's correspondence raised substantive arguments against the Committee's determination, and requested a 90-day extension in which to supplement his appeal prior to initiating a lawsuit.  Def.'s SOMF ¶ 54; Pl.'s SOMF ¶ 45.  By e-mail dated March 9, 2016, counsel for the Fund Michelle Woolley wrote to Mr. Frumkin stating the following:

> Dear. Mr. Frumkin:
>
> I just left you a message at your office, though I understand you are on vacation.  Per your letter of March 7, 2016, the Fund agrees to a 90 day extension of the deadline to file suit under Section 502(a) of ERISA. I would like to discuss this matter with you at your earliest convenience so I can more fully understand the argument made in your letter. Also, you should be aware that under the terms of the Plan, the Appeals Committee only reviews an appeal once. That being said, we encourage a dialogue with counsel before any litigation is filed.

Post-Appeal Correspondence, attached to Defendant's motion for summary judgment as Exhibit C [DE 37-7] ("PAC") at 23.

Following a telephone conversation between counsel, Plaintiff's attorney sent an email to the Fund's counsel attaching a printout of Plaintiff's hourly work records with Triple S and offered to attempt to obtain an affidavit from Benkovsky to support the assertion that Plaintiff did not provide any work to J & S.  Def.'s SOMF ¶ 58; Pl.'s SOMF ¶ 51; PAC at 24.  In an email dated March 28, 2016, Fund counsel Michelle Woolley wrote to Mr. Frumkin stating as follows:

---

[4]  The Court acknowledges that the administrative record necessarily does not include post-appeal correspondence; however, for reasons that are explained in detail below, this correspondence can be considered "material" in the instant action.

Dear Bill:

I am in receipt of Mr. Gosselin's hourly work records for Triple S Air Systems, Inc. ("Triple S") forwarded by you via email on March 21, 2016. After reviewing these documents, I believe some clarification is required to explain the basis of the Appeals Committee's denial of Mr. Gosselin's appeal.

To be clear, the Fund does not dispute the hours Mr. Gosselin worked for Triple S or the credits he accrued during that time period. Rather, the crux of the Appeals Committee's decision relates to whether Mr. Gosselin had employment in the Sheet Metal Industry that was not covered by a collective bargaining agreement, rendering him ineligible for a 55/30 Pension under Section 5.09 of the Plan, and causing a delay in his early retirement pension under Sections 5.05(a) and 5.06(b) of the Plan for benefits earned after August 31, 1988.

As defined by Section 1.35 of the Plan, "Sheet Metal Industry" means any work covered by collective bargaining agreements that SMART or its locals are party to, and work under the trade jurisdiction of the Union, as described in Article 1, Section 5 of the SMART constitution. As explained in the Fund's December 19, 2015 letter to your client, the Appeals Committee determined that J&S shares the same facility as a sheet metal company that is party to a SMART CBA, J&S's name includes "Fabricators", and that J&S is still an active entity. The owner of J&S Fabricators Systems ("J&S") clearly stated that J&S was created to own equipment used to perform work and to operate in the Sheet Metal Industry. As a result, the Appeals Committee concluded that J&S conducts work in the Sheet Metal Industry covered by a collective bargaining agreement or under the trade jurisdiction of SMART.

J&S reported to the Social Security Administration that your client was employed by J&S Fabricators Systems. There is no contention that the bonuses paid to your client through J&S were pursuant to Triple S Air Systems' CBA. There is no dispute that J&S was not party to a collective bargaining agreement – J&S's owner confirmed this in his statement, stating that the "company does not perform any work under a collective bargaining agreement."

Because J&S was an employer in the Sheet Metal Industry and was not party to a collective bargaining agreement, Mr. Gosselin's benefits are subject to early retirement delays. The Fund understands Mr. Gosselin's argument that his employment with J&S was for the purpose of paying bonuses, but official filings with the

Federal government indicate that your client was paid by J&S for employment by a non-signatory company in the Sheet Metal Industry.

If you have additional questions or can provide evidence that Mr. Gosselin was not an employee of a non-signatory company in the Sheet Metal Industry, feel free to call or email me. The Fund is compiling the documents you requested and will have them to you within the 30 day legal time limit. As we've previously discussed, the Appeals Committee's decision is final and binding, and your client is entitled to challenge the Appeals Committee's decision by filing suit against the Fund under Section 502(a) of ERISA.

PAC at 40-41; *see* Def.'s SOMF ¶¶ 59-62; Pl.'s SOMF ¶ 53.

In a letter dated May 19, 2016, Attorney Frumkin wrote to Attorney Woolley, stating, "[i]n furtherance of Mr. Gosselin's request for reconsideration of the denial of his application for a 55/30 pension, enclosed please find an affidavit executed under oath before a notary from the owner of J & S Fabricators, Inc." PAC at 52; Def.'s SOMF ¶ 63; Pl.'s SOMF ¶ 54. In the affidavit attached to Attorney Frumkin's letter, Steven Benkovsky asserted as follows:

> 1.      I am the former president of J & S Fabricators, Inc. ("J & S") a company under dissolution and I make this affidavit in support of the Appeal of Raymond Gosselin for a 55/30 pension from the Sheet Metal Workers' National Pension Fund (the "Fund").

> 2.      This affidavit will supplement the letter I sent to a representative of the Fund on behalf of Mr. Gosselin dated March 17, 2015.

> 3.      In addition to the comments contained in my letter, I wish to clarify that Mr. Gosselin performed all his work for Triple S Air Systems, Inc. and never performed not even one second [*sic*] of work for J & S. In addition, the payment that he received as a compensation bonus was totally my decision and Mr. Gosselin had absolutely no control with respect to that decision and in fact, had no way of knowing anything about the ownership and purpose of J & S as a business entity. To make any decisions regarding Mr. Gosselin's pension service, resulting from his receipt of any payments from J & S is completely without any basis in fact.

PAC at 53; Def.'s SOMF ¶ 63; Pl.'s SOMF ¶ 55.

14

On July 5, 2016, Attorney Frumkin emailed Attorney Woolley as follows:

> Please be advised that we looked into the issue of filing amended tax returns to wipe out the bonus payment from the non-signatory company. Unfortunately amended tax returns can only be filed going back 3 years, which is not going to cure the problem for the time period in question. Please see the IRS tax bulletin below at p. 19-20 that confirms this is the case. Therefore I don't know where this leaves us. If this cannot be settled with confidentiality we are going to have to file the lawsuit and determine if my client is correct. If we are successful the Fund isn't going to be able to continue to do this. We both know this was a legitimate error on the part of the owner that my client had no control over.

PAC at 55; Pl.'s SOMF ¶ 56.  On July 8, 2016, Attorney Woolley responded to Attorney Frumkin by email, stating "[u]nfortunately, I am unable to suggest any other resolution.  The Fund is remarkably consistent in how it applies the definition of employment in the Sheet Metal Industry with regard to early retirement benefit delays and we cannot make an exception for your client."  PAC at 54; Def.'s SOMF ¶ 64; Pl.'s SOMF ¶ 58.

## B.    Relevant Procedural History

Plaintiff filed his Complaint with the Court on August 5, 2016.  *See* DE 1.  He filed an Amended Complaint on October 18, 2016.  *See* DE 13.  The Fund filed its Answer on November 4, 2016.  *See* DE 16.  On December 16, 2016, Plaintiff moved this Court for an Order permitting discovery beyond the administrative record.  *See* DE 19.  This Court issued a Memorandum and Order on August 4, 2017, denying Plaintiff's motion for discovery beyond the administrative record.  *See* DE 21.   The Court found that based on the allegations in the Amended Complaint and additional material submitted, Plaintiff had failed to make "specific factual allegations" to support his argument that a conflict of interest existed "based upon the fact that the Fund both pays and determines benefits" sufficient to warrant discovery into the purported conflict.  *Id*. at 21.

On December 8, 2017, both Plaintiff and the Fund filed letter requests to Judge Spatt for a pre-motion conference for purposes of moving for summary judgment. *See* DE 29, 30. Judge Spatt held a pre-motion conference with both parties on January 31, 2018, and set a briefing schedule for the motions. *See* DE 31. Both parties' motions for summary judgment and oppositions to each other's motions were filed on April 6, 2018, and May 7, 2018, respectively. *See* DE 37-38, 40-41. On September 26, 2018, Judge Spatt referred both motions for summary judgment to this Court for a Report and Recommendation as to whether the motions should be granted.[5] *See* DE 46.

### C. The Parties' Positions

The Court briefly summarizes the arguments of each side before moving to its analysis.

#### 1. *Plaintiff's Motion for Summary Judgment*

##### a. Standard and Scope of Review

Plaintiff argues that the Court must vacate the Appeals Committee's decision upholding the Fund's denial of his application for pension benefits because the decision fails to satisfy the appropriate standard of review. Plaintiff's Memorandum in Support of his Motion ("Pl.'s Mem.") [DE 36-1] at 12. Specifically, Plaintiff argues the determination was "arbitrary and capricious," in that it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id*. In reviewing the Committee's decision under the applicable standard of review, Plaintiff contends that the Court must consider (1) the Fund's inherent conflict of interest and (2) documents beyond the administrative record. As to the alleged conflict, Plaintiff argues

---

[5] Each party has also filed a motion for oral argument, *see* DE 38, 39, which Judge Spatt referred to this Court. *See* Electronic Order dated September 26, 2018. The Court has declined to hold oral argument on the cross-motions, finding such argument to be unnecessary in light of the paper submissions.

a structural conflict of interest existed between the Fund's self-interest in its own financial solvency and its duty to decide benefits eligibility.  *See id.* at 12-13.  Plaintiff also asserts that the Court should consider documents related to post-appeal correspondence – which he admits are beyond the administrative record – notwithstanding the presumption that in an ERISA appeal a court's review is limited to the record that was before the claims administrator.  *See id.* at 14-15. According to the Plaintiff, these documents should be considered by the Court "because they were considered, at least by the Fund's counsel, if not by the Appeals Committee."  *Id.* at 15.

### b.    The Fund's Determination

Plaintiff attacks the determination of the Appeals Committee by arguing that the Fund had no evidence that Plaintiff was actually employed by J & S, while it did have direct evidence that he was *not* employed by J & S.  *See* Pl.'s Mem. at 16-17.  Plaintiff highlights what he sees as the Fund's focus on the SSA report, to the exclusion of other evidence, which report Plaintiff argues does not demonstrate that Plaintiff performed actual work for J & S.  *Id.* at 17.  Plaintiff views the Fund's reliance on the SSA records to actually impose a different legal standard, one which conflicts with the plain language of the Plan:

> By focusing on the Social Security Administration records and ignoring Plaintiff's evidence, the Fund effectively interpreted the Plan to allow denial of benefits whenever a participant receives any payment from a company in the Sheet Metal Industry, rather than [ ] following the plain language of the Plan which requires a finding that the participant "performed . . . employment" for such a company.

*Id.* at 20.  In addition to arguing that the Appeals Committee improperly focused on the SSA records, Plaintiff points to Benkovsky's statements, which he contends constitute direct evidence that Plaintiff was *not* employed by J & S and performed *no* work for the company.  Having been presented with this evidence, "the Fund should have made efforts to investigate or clarify the

disputed issue," according to Plaintiff, and its failure to do so "renders its determination arbitrary and capricious." *Id*. at 18. Plaintiff also argues that the Fund has undertaken similar investigations in other appeals and its failure to do so in Plaintiff's case is further evidence of its arbitrary and capricious determination. *Id*. at 18-19.

Plaintiff's other argument, apart from how (and whether) the Fund considered all the evidence before it, is that the way the Fund applied the Plan provisions to Plaintiff's circumstances is inconsistent with how it applied Plan provisions in factually similar appeals. *See* Pl.'s Mem. at 21-24. This fact, Plaintiff argues, indicates that the Fund acted arbitrarily or capriciously with respect to Plaintiff. *Id*. Plaintiff's motion presents three appeals which he alleges are factually similar to his but in which the Fund acted in a materially different manner – one in which the Fund credited the explanation of a company's president about payment arrangements, *see id*. at 21-22; one in which the Fund took seriously an applicant's statements that he had not received payment for work performed but rather for bonuses and for which the Fund sought out documentation from an employer to verify this information, *see id*. at 22; and one in which the Fund proactively requested information regarding payments at issue. *See id.* at 23.

### 2. *The Fund's Motion for Summary Judgment*

The Fund agrees with Plaintiff that the appropriate standard of review is whether the Appeals Committee's determination upholding the denial of Plaintiff's application for pension benefits was arbitrary or capricious or supported by substantial evidence. *See* Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem.") [DE 37-1] at 2. As to why its determination was not arbitrary or capricious, the Fund argues that (1) Plaintiff "did not deny that he received income from J & S or that J & S operated at the same address as

his Union employer, Triple S, which describes its work as designing and fabricating 'sheet metal ductwork for HVAC systems,'" *id*. at 13; (2) Plaintiff "never asserted that the payments from J & S were made pursuant to Triple S's collective bargaining agreement with the Union," *id*. at 13-14; (3) Plaintiff submitted a statement from Benkovksy "admitting that J & S was established to own equipment for use in the Sheet Metal Industry and that it did, in fact, own equipment used in the Sheet Metal Industry by another company," *id*. at 14; and (4) the Appeals Committee did not err in discounting the probative value of Gosselin's argument and the letter from Benkovsky asserting that he performed no work for J & S," because "Benkovsky's letter contained inexplicable contradictions" – including that J & S would be dissolved by April 30, 2015, while in December 2015 it was still an active company – and "the letter contained no explanation for why  J & S would issue a bonus check to an employee of another company (Triple S) for his work for that separate company."  *Id*. at 14.

The Fund specifically addresses Plaintiff's argument that it was improper to rely on the SSA records, asserting that given the data contained in Social Security Earnings Statements, it was reasonable and logical to assume that based on the SSA records, J & S reported Plaintiff's income to the IRS and SSA on a W-2 form.  Def.'s Mem. at 15.  The Fund then appears to claim that because Plaintiff "could have received payment [from J & S] through a 1099 [form] without the extra taxes and required benefits that come with paying an individual through a W-2, it makes no sense why J & S would pay Gosselin through a W-2 if he did not perform work as an employee" of J & S.  *Id*. at 16.

The Fund's final argument is that its denial of Plaintiff's appeal was consistent with other Appeals Committee determinations.  In two previous appeals determinations involving both J & S and Triple S, the Committee concluded that "evidence did not support the participants' claims

in the face of Social Security Earnings Statements conveying that they were employed by J & S." Def.'s Mem. at 17.  The Fund goes on to state that, "[r]elevant to the determination here, though not noted in the Appeals Committee's written decision, are the admissions by these other participants that 1) J & S did indeed perform work in the Sheet Metal Industry; and 2) that one of the participants reported actual tasks performed for J & S before changing his story to claim that he performed work and instead was paid bonuses for his work with Triple S."  *Id.*

### 3.    *Plaintiff's Opposition to the Fund's Motion*[6]

Plaintiff first alleges that the Fund's contention that he "never explained why he would be paid from the payroll of a completely separate non-union company" misrepresents the record because Plaintiff stated that these payments were for Christmas bonuses.  Plaintiff's Memorandum in Opposition to Defendant's Motion ("Pl.'s Opp'n.") [DE 40] at 3-4.  Plaintiff also disputes the Fund's argument that the Committee properly relied on the fact that Benkovsky's letter contained no explanation about why a bonus check from J & S would be issued to an employee of Triple S.  As he argues, "whether Plaintiff's employer explained why he used another company's account to Pay Plaintiff's bonuses should have no bearing on the issue at hand of whether Plaintiff 'performed employment' for J&S."  *Id*. at 4.  According to the Plaintiff, "Defendant repeatedly misrepresents the content of the Social Security earnings statement that was considered by the Fund."  *Id*. at 6.  The only thing the SSA report shows, Plaintiff claims, is that J & S reported earnings for Plaintiff; the report does not make any statement about whether Plaintiff was an employee of J & S.  *Id*.

Plaintiff next contends that the Court should not consider any facts or arguments regarding IRS filings that were not raised before and considered by the Appeals Committee.

---

[6]  The Court does not recite arguments already identified in Plaintiff's motion.

Specifically, Plaintiff takes issue with the Fund's argument that it would not have made sense for J & S to pay him through a W-2 if he was not an employee because "the Appeals Committee did *not* consider *any* facts or arguments regarding whether the payments to Plaintiff were reported on a W-2." Pl.'s Opp'n. at 12-13 (emphasis in original). The Fund's W-2 argument, according to the Plaintiff, is a form of post-hoc justification and such post-hoc justification can evidence arbitrary and capricious decision-making. *See id*. at 13. The arguments fail even if the Court were to consider them, according to Plaintiff, because payments by J & S to Plaintiff were bonuses for work performed for Triple S, and "[b]onuses are considered wages and should be reported on an IRS W-2 form, not a 1099 form." *Id*. at 14. Similarly, Plaintiff contends that the Court should not consider the Fund's arguments as to the two prior appeals involving J & S and Triple S because the Committee's written decision does not cite these prior appeals or the alleged admissions of the claimants in them. *Id*. at 18. Moreover, if the Committee did consider the circumstances of these two cases in ruling on Plaintiff's appeal, such action would violate ERISA § 503. *Id*. The rationale is that Section 503 requires the Fund to provide the specific reasons for its denial of an appellant's claim, and failing to reference these prior decisions, if considered by the Committee, would therefore be a violation. *Id*.

### 4.    The Fund's Opposition to Plaintiff's Motion[7]

The Fund does not disagree with Plaintiff that the Court is able to consider materials outside of the administrative record. *See* Defendants Memorandum in Opposition to Plaintiff's Motion ("Def.'s Opp'n.") [DE 41] at 2. However, the Fund rejects Plaintiff's argument that it relied disproportionately (or exclusively) on the SSA records in denying Plaintiff's appeal. *Id*. at 4. The Fund contends that the Appeals Committee *did* consider the statements of Plaintiff and

---

[7]    The Court does not recite arguments already identified in the Fund's motion.

Benkovsky but refused to credit the statements as uncorroborated and self-serving.  *Id*.  The Fund also challenges Plaintiff's assertion that the Committee did not perform a sufficiently searching review of Plaintiff's appeal.  *Id*. at 7.  It points to the following post-appeal correspondence:  "The Fund does not often engage with participants after the Appeals Committee has made a decision," but it "may review a decision if presented with new information supported by credible evidence that suggests the Appeals Committee's prior determination was incorrect under the Plan Document."  *Id*.  "The Fund gave Gosselin this opportunity," it argues, "but he did not present any new, relevant, and credible evidence in support of his objections to the Appeals Committee's decision."  *Id*.  According to the Fund, the only potentially relevant additional material submitted by Plaintiff was Benkovsky's affidavit, which still did not explain (1) why Plaintiff was paid on the J & S payroll, and (2) why "J & S would assert to the federal government that Gosselin was its employee if he wasn't."  *Id*. at 14.

An additional argument raised by the Fund is that any consideration by the Court of the Fund's purported conflict of interest is improper.  The Fund points to this Court's Order denying discovery beyond the administrative record, which found that Plaintiff's allegation of a structural conflict of interest based on the past financial difficulties of the Fund was predominantly speculative.  *See* Def.'s Opp'n. at 15.  According to the Fund, the Court must reject Plaintiff's argument that the Court should take into consideration this alleged conflict in determining whether the Appeals Committee's decision was arbitrary or capricious.  *Id*.

### III.    FEDERAL RULE OF CIVIL PROCEDURE 56

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving

party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*, No. 09 Civ. 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (internal quotation marks omitted) ("The Court's goal should be to isolate and dispose of factually unsupported claims.").

Significantly, the above standard applies where, as here, both parties have filed cross-motions for summary judgment.  In such circumstances, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party

whose motion is under consideration." *Sussman v. Rabobank Int'l*, 739 F. Supp. 2d 624, 627 (S.D.N.Y. 2010) (quoting *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001) and citing *S.E.C. v. Lyon,* 605 F. Supp. 2d 531, 540 (S.D.N.Y. 2009)).

## IV.    ERISA:  PRELIMINARY ISSUES

In light of the fact that each party has moved for summary judgment, there appears to be agreement that "[s]ummary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA." *Alfano v. CIGNA Life Ins. Co. of N.Y.*, No. 07 Civ. 9661, 2009 WL 222351, *12 (S.D.N.Y. Jan. 30, 2009).  "In such an action 'the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA.'" *Id.* (quoting *Ludwig v. NYNEX Service Co.*, 838 F. Supp. 769, 780 (S.D.N.Y. 1993)); *see Donlick v. Standard Ins. Co.*, No. 16-CV-617, 2017 WL 1683060, at *2 (N.D.N.Y. May 2, 2017), *aff'd*, 726 Fed. App'x 12 (2d Cir. 2018).  Before the Court begins its analysis as to the Committee's determination, two threshold issues must be addressed, namely, the proper standard, and scope, of the Court's review under ERISA.

### A.    Standard of Review of the Fund's Determination

"When an ERISA plan provides an administrator with discretion to determine benefits, the administrator's determination of benefits should be upheld unless it was arbitrary or capricious." *Petri v. Sheet Metal Workers' Nat'l Pension Fund*, No. 07 CIV. 6142, 2009 WL 3075868, at *5 (S.D.N.Y. Sept. 28, 2009) (citing *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U.S. 101, 115 (1989)); *Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 146–47 (2d Cir. 2009) ("Since the terms of the Plan grant the Trustees discretionary authority to interpret the Plan, the standard governing the district court's review, and accordingly

our review here, is the arbitrary-and-capricious standard.").  Under this deferential standard of review, the Court must not overturn the plan administrator's denial of benefits unless its decision is found to be "without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Pepe*, 559 F.3d at 146-47 (quoting *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441-42 (2d Cir. 1995)).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance."  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (quoting *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 147 (2d Cir. 2003)).

It is undisputed that the Plan Document gives the Fund's Board of Trustees the sole discretionary power to determine entitlement to pension benefits, which has in turn delegated its authority to the Appeals Committee, and which, accordingly, has the same discretionary power and authority as the Board of Trustees to interpret the Plan Document and determine entitlement to benefits.  *See* Def.'s SOMF ¶¶ 3-4; Pl.'s 56.1(b) Response ¶¶ 3-4.  As a result, and as both parties agree, the appropriate standard of review of the Committee's determination is whether it was arbitrary or capricious, or unsupported by substantial evidence.  What is more nuanced, however, is the proper scope of the Court's review.

### B.     Scope of Review of the Fund's Determination:  Evidence Beyond the Administrative Record

The posture of a district court in an ERISA appeal is in effect that of an appellate court. *See Anderson*, 2006 WL 1722576, at *14.  That is why, as noted at the beginning of this Report and Recommendation, "district courts must generally limit their review to the administrative record."  *Tyll v. Stanley Black & Decker Life Ins. Program*, No. 3:17-CV-1591, 2018 WL 5847240, at *2 (D. Conn. Nov. 8, 2018).  This rule was articulated by the Second Circuit in

*Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995), where, after comparing the

rules in other circuits, the Court found that "[o]nly the Fifth Circuit has allowed a broader scope

of review." *Id.* at 1071. The Second Circuit reasoned this rule was "consistent with the fact that

nothing 'in the legislative history suggests that Congress intended that federal district courts

would function as substitute plan administrators' and with the ERISA 'goal of prompt resolution

of claims by the fiduciary.'" *Id.* (quoting *Perry v. Simplicity Eng'g, a Div. of Lukens Gen.*

*Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990)).

While *Miller*'s rule that "a district court's review under the arbitrary and capricious

standard is limited to the administrative record," *Miller*, 72 F.3d at 1071, still holds as a general

matter, as a court in this Circuit has recently observed, "the case law that post-dates *Miller* has

called into question the impact that this statement in *Miller* has on determining whether to admit

extrinsic evidence upon a showing of 'good cause' for cases under the arbitrary and capricious

standard of review." *Donlick*, 2017 WL 1683060, at *4 (collecting cases). The post-*Miller* cases

referenced by *Donlick* indicate that under certain circumstances, a court may, in its discretion,

admit and consider evidence beyond the administrative record if it finds good cause to do so.

*See, e.g., Demonchaux v. Unitedhealthcare Oxford*, No. 10 Civ. 4491, 2012 WL 6700017, *11

(S.D.N.Y. Dec. 20, 2012) ("In ERISA cases applying arbitrary and capricious review, a district

court's decision to admit evidence outside the administrative record is discretionary.") (internal

quotation marks omitted); *Biomed Pharms., Inc. v. Oxford Health Plans (N.Y.), Inc.*, 831 F.

Supp. 2d 651, 658 (S.D.N.Y. 2011) ("While it is true that a court's review of an ERISA claim

under an arbitrary and capricious standard is generally limited to evidence in the administrative

record, the court has discretion to admit evidence outside the record upon a showing of 'good

cause.'") (internal quotation marks omitted); *Ramsteck v. Aetna Life Ins. Co.*, No. 08 Civ. 12,

2009 WL 1796999, *7 (E.D.N.Y. June 24, 2009) ("While [t]he decision whether to consider evidence from outside the administrative record is within the discretion of the district court[,] the presumption is that judicial review is limited to the record in front of the claims administrator unless the district court finds good cause to consider additional evidence.") (internal quotation marks and citations omitted)); *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (applying arbitrary and capricious review to defendant's refusal to reimburse plaintiff's surgery expenses, but admitting evidence outside administrative record) (citations omitted).

Plaintiff contends that the documents constituting post-appeal correspondence between Plaintiff's counsel and the Fund should be considered by the Court "because they were considered, at least by the Fund's counsel, if not by the Appeals Committee." Pl.'s Mem. at 15. The Fund states that it "does not object to this Court's consideration of the materials outside the Administrative Record that Gosselin proposes." Def.'s Opp'n. at 2. While the apparent agreement between the parties that post-appeal correspondence be considered should not abrogate what is an otherwise limited scope of review, the Court finds that "good cause" exists here to consider the post-appeal correspondence. In the Court's view, this correspondence is part-and-parcel of a full review of whether the Fund's true reasoning in denying Plaintiff's claim was as stated in the Appeals Committee's written decision. *See Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 295 (2d Cir. 2004) ("We have also found that 'good cause' for consulting evidence outside the administrative record existed where an insurer's claimed reason for denying a claim was not stated in its notices to the claimant . . . ."). In light of Plaintiff's allegation that the Fund engaged in improper post-hoc justification, *see* Pl.'s Opp'n. at 13, the Court finds it proper to consider the post-appeal correspondence. What's more, the agreed-upon evidence is limited in its scope, comprising only several pieces of correspondence between the Fund and the

Plaintiff.  For these reasons, the post-appeal correspondence will be considered in the following analysis.

## V.   DISCUSSION

### A.   The Committee's Weighing of the Evidence

Plaintiff argues that the Appeals Committee failed to consider the explanations provided by Plaintiff and Steven Benkovsky as to why Plaintiff was paid on the payroll of J & S.  *See* Pl.'s Mem. at 16-17.  The Fund argues that it did consider this evidence; however, it "discount[ed] the probative value of Gosselin's argument and the letter from Benkovsky asserting that he performed no work for J & S."  Def.'s Mem. at 14.  The Committee's written decision states the following as to this evidence:

> The Committee also reviewed correspondence dated March 17, 2015 from Steven Benkovsky (as the President of J & S) . . . .
>
> The Committee observed that Mr. Benkovsky acknowledged that J & S was established to own equipment to be used by another company in the industry.  The Committee interpreted this to mean that J & S owned equipment that was used in the industry (i.e., the Sheet Metal Industry), which is consistent with the fact that it is located at the same facility as Triple S Air Systems and has the word "Fabricators" in its name.
>
> The Committee also noted that although you maintain that your income from J & S was the result of bonus checks paid and travel expenses paid on behalf of Triple S Air Systems, the earnings reported to the SSA show that you received earned income as an employee of J & S Fabricators. . . . The Committee observed that Mr. Benkovsky did not provide any explanation as to why a bonus check would be issued by J & S to an employee of another company.

AR at 003-004.

The Court sees no reason not to credit the Committee's own written assertion that it did consider the explanations of Plaintiff and Steven Benkovksy, but chose to discount the

explanations in light of Mr. Benkovsky's failure to explain *why* he allegedly paid Plaintiff in the manner in which he did.

The question then becomes, in weighing the evidence in the manner set forth in its written decision and coming to the conclusion which it did, did the Committee act in an arbitrary or capricious manner, or does its decision lack substantial evidentiary support?  This analysis can be distilled to a single, limited question given the circumstances of this case:  was the Committee's finding that Plaintiff performed at least one hour "of employment" for J & S within the meaning of the Plan Document a reasonable finding based on the evidence before it?  Keeping in mind that federal courts "are not free to substitute [their] own judgment for that of the [plan administrator] as if [they] were considering the issue of eligibility anew," *Celardo*, 318 F.3d at 146 (quoting *Pagan*, 52 F.3d at 442), the Court cannot say the Appeals Committee's determination that Plaintiff performed "employment" with J & S – resulting in the Committee's affirmation of the Fund's denial of Plaintiff's benefits application – was arbitrary or capricious, or lacking substantial evidence.

As the decision itself sets forth, the Committee examined:  (1) SSA records which "clearly showed that [Plaintiff] received earned income from J & S Fabricators," AR at 003; (2) "a D & B report and information from the Secretary of State of New York, which showed that J & S Fabricators is still an active entity and that it shares the same address and telephone number as Triple S Air Systems," *id.*; (3) an online description of the work performed at the address of J & S and Triple S, which indicated that fabrication work took place at the location, *id.*; (4) the full name of the J & S entity – J & S *Fabricators*, *id.*; and (5) correspondence from Steven Benkovksy, which (a) acknowledged that J & S was established to own equipment to be used by another company in the sheet metal industry, *id.* at 003-004, and (b) failed to provide

any explanation as to why Benkovsky paid Plaintiff's Christmas bonuses on the J & S payroll if Plaintiff did no work for the company. *Id*. at 004. Against the backdrop of this evidence, the Committee had Plaintiff's written statement that he "received [J & S] money as bonuses for work done at Triple S Air Systems," Pl.'s SOMF ¶ 31; Def.'s 56.1(b) Response ¶ 31, and Steven Benkovksy's written statement that "[f]rom time to time, bonuses were paid to some employees for the industry company which came out of the J and S account. . . . However, no sheet metal work was done by J and S." AR at 032. Whether this Court would have come to the conclusion that Plaintiff performed "employment" for J & S in light of the above evidence, the Court finds that such a conclusion was not so unreasonable or lacking in evidentiary support as to be "arbitrary or capricious." Indeed, as explained by the Committee and recounted above, the evidence upon which its decision was based was multi-pronged.

"[I]n cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015) (collecting cases). "In other cases, the record evidence may not conflict—the only available evidence may, in fact, point in the claimant's favor—but it may nonetheless be permissible for the plan administrator to conclude that the evidence is insufficient to support the claim." *Id*.; *see Juliano v. Health Maint. Org.*, 221 F.3d 279, 287-88 (2d Cir. 2000) (explaining that an ERISA claimant bears the burden of establishing his entitlement to benefits). In the instant matter, the Appeals Committee drew its conclusions from several pieces of conflicting evidence. The Court takes a moment to address the nature of this conflict. Of special import is the observation by the Committee that, notwithstanding Steven Benkovksy's attempt to explain the circumstances under

30

which he paid Plaintiff's bonuses on the J & S payroll, "Mr. Benkovsky did not provide any explanation as to why a bonus check would be issued by J & S to an employee of another company." AR at 004. In the Court's view, this omission is conspicuous and the Committee's determination to either discount or decline to credit entirely Plaintiff and Mr. Benkovsky's assertions based on this omission was not unreasonable. *See Jiras v. Pension Plan of Make-Up Artist & Hairstylists Local 798*, 170 F.3d 162, 166 (2d Cir. 1999) (failing to find "the kind of 'clear error of judgment' that would warrant judicial reversal" of a fund's denial of pension benefits where plaintiff offered no relevant documentation "and the only affidavit supporting his position was unsubstantiated and came from a witness who offered materially erroneous testimony"). Were Mr. Benkovsky to provide a meaningful explanation as to why he paid certain bonuses on a different payroll – something even his post-appeal affidavit fails to elucidate – then the determination that Plaintiff performed employment for J & S might rise to the level of being arbitrary or capricious. However, that is not the case here.

The Court must also briefly address Plaintiff's argument that "[t]he Fund's determination with regard to Plaintiff is not supported by substantial evidence, because the Fund did not obtain any evidence that Plaintiff performed employment for J&S." Pl.'s Mem. at 16. Plaintiff's argument is a direct attack on what he sees as the improper and exclusive reliance on the SSA records as evidence of employment. *Id*. at 17 ("[A]lthough J&S apparently reported earnings to the SSA for Plaintiff, such records do not demonstrate that Plaintiff actually performed any employment for J&S."). This contention is at the heart of Plaintiff's theory: that evidence of compensation is not or cannot be reasonably interpreted to be evidence "of employment." The Court disagrees. Plaintiff's logic inserts an artificial barrier between the contractual consideration necessary to the employee-employer relationship, namely, labor for compensation,

and vice versa. It was not unreasonable for the Fund to interpret evidence of one (compensation from J & S) as evidence of the other (labor performed for and employment with J & S) since it would be unusual in most circumstances to see one without the other. Nor has Plaintiff provided any legal authority to support his contention that interpreting SSA reports showing earned income as evidence of employment by the payor of that income is unreasonable or legally erroneous. For the same reason, the Court rejects Plaintiff's argument that in construing evidence of income by way of SSA reports as evidence of employment, the Fund was effectively applying a different standard – that SSA records "not show any other earnings from a company that may be in the Sheet Metal Industry" – from the standard set out in the Plan Document. Pl.'s Mem. at 20.

In *Petri v. Sheet Metal Workers' Nat'l Pension Fund*, No. 07 CIV. 6142, 2009 WL 3075868 (S.D.N.Y. Sept. 28, 2009), the District Court for the Southern District of New York found the Fund's refusal to reinstate the plaintiff's early retirement pension benefits not to be unreasonable. The plaintiff in that case took issue with "the investigative tools relied on by the Appeals Committee—a Social Security Administration Itemized Statement of Earnings and Dun & Bradstreet reports—but [did] not deny the underlying fact that [he] was employed by a Contributing Employer after he began receiving Early Retirement Pension Benefits." *Petri*, 2009 WL 3075868, at *8. The Fund argues that the Appeals Committee properly relied on the same sources of information in both *Petri* and the instant appeal, *see* Def.'s Mem. at 16-17, while Plaintiff attempts to distinguish *Petri* by observing "that the plaintiff in that case did not deny the underlying fact that Petri was employed by a Contributing Employer . . . . In contrast, here, Plaintiff explicitly denies that he was employed by J&S." Pl.'s Opp'n. at 12 (internal quotation and citation omitted).

In *Petri*, the plaintiff's ERISA appeal was likely unsuccessful from the outset given that, as Plaintiff observes, he did not deny that he was employed by a Contributing Employer. For this reason, the court in *Petri* found the Appeals Committee's decision "clearly reasonable" and "close to unassailable." *Petri*, 2009 WL 3075868, at *8. Notwithstanding the plaintiff's admission in *Petri*, that decision indicates that an SSA earnings report can constitute viable evidence of employment under ERISA. *See id.* ("The plaintiff does not dispute that his Social Security Itemized Statement of Earnings shows that he received earning from John's Metal Works in 2005. It was not unreasonable for the Appeals Committee to conclude that the plaintiff's affiliation with John's Metal Works similarly constituted Disqualifying Employment under the Plan.") (internal citation omitted). This Court thus reads *Petri* to support the conclusion that the Committee did not err in relying, *inter alia*, on the SSA earned income report.[8]

Lastly, the Court must address Plaintiff's several related contentions that the other evidence relied upon by the Appeals Committee does not constitute "substantial evidence" in support of its decision. For example, Plaintiff argues that the Dunn & Bradstreet report and the Secretary of State records are probative only of whether J & S was a business in the Sheet Metal Industry, not of whether Plaintiff was employed by and performed work for J & S. *See* Pl.'s

---

[8] "In determining whether, in an ERISA eligibility determination, the interpretation is arbitrary and capricious, the relevant factors were considered, or substantial evidence was relied upon, the Court is limited to the reasons given 'at the time of the denial.'" *Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 324 (D. Conn. 2009) (quoting *Karanda v. Conn. Gen'l Life Ins. Co.,* 158 F. Supp. 2d 192, 198 n.4 (D. Conn. 2000)); *see Peterson v. Cont'l Cas. Co.,* 282 F.3d 112, 117 (2d Cir. 2002) ("It is well established that federal courts have a narrow role in reviewing the discretionary acts of ERISA plan administrators."). Accordingly, the Court does not credit or consider the Fund's several arguments which concern subject matter beyond the four corners of the Appeals Committee's written decision, including how Plaintiff was "classified" on J & S' W-2 and the potential motivation for this. *See, e.g.*, Def.'s Mem. at 15-16; Def.'s Opp'n. at 5-6.

Mem. at 17; Pl's Opp'n. at 10.  This is too narrow a view of the evidentiary value of this information.  In the Court's view, the evidence considered by the Appeals Committee, other than the SSA report, can be seen to have probative value into whether Plaintiff was performing "employment" for J & S.  By way of example, if J & S was shown to be a dissolved or otherwise inactive business entity as Mr. Beknovsky stated, the Committee could infer that it was unlikely that Plaintiff was performing any actual employment-related labor for that entity.  The fact that the Committee had evidence to the contrary supports its conclusion that Plaintiff was employed by and performing work for J & S.  Similarly, Plaintiff argues that "the Fund's review of Triple S's website (not J&S's website) has absolutely no bearing on the issue of whether [ ] Plaintiff [ever] performed work for J&S."  *Id*. at 18.  The Court disagrees.  Because J & S and Triple S shared the same address, the Court does not find it unreasonable to view the operations of Triple S as relevant to an inquiry into the operations of J & S, which may itself be relevant to Plaintiff's relationship with J & S.  Accordingly, the Court reads the Appeals Committee's statement that that these pieces of additional information beyond the SSA report were reviewed "[f]or purposes of determining whether [Plaintiff's] employment with J & S Fabricators constituted employment in the Sheet Metal Industry" as stating that fact.  AR at 003.

> ### B.     The Fund's Conflict of Interest

Plaintiff contends that "[a]lthough Judge Tomlinson denied Plaintiff discovery beyond the administrative record regarding the conflict of interest, she acknowledged that a structural conflict of interest does exist here."  Pl.'s Mem. at 12 (internal citation omitted).  Arguing that because the "the Fund has [ ] motivation to deny claims to conserve Fund assets because it was in 'critical status' as of 2010 recently and was in 'endangered status' at the time Plaintiff's claim was denied in 2015," Plaintiff insists that the Court should consider this conflict in its

determination of the instant motions.  *Id.* at 13.  To clarify, this Court did not go so far as Plaintiff suggests in identifying a structural conflict of interest in its August 4, 2017 Memorandum and Order.  Rather, the Court declined to address the Fund's unsupported argument that no such conflict existed simply because the Management Trustee recused himself from the appeal proceedings, *see* DE 21 at 18-19, and proceeded on the assumption that a *per se* structural conflict of interest existed under the well-recognized principle that a plan administrator is conflicted when that administrator "both evaluates claims for benefits and pays benefits claims."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009); *see* DE 21 at 19.  The Court ultimately determined, however, that Plaintiff had failed to make specific factual allegations to support his more general allegation that the conflict actually affected the Fund's determination.  Accordingly, the Court found that there was insufficient "good cause" to engage in discovery beyond the administrative record.  *See* DE 21 at 23.

In ERISA appeals, courts must consider such a structural conflict of interest as "a factor in determining whether the plan administrator has abused its discretion in denying benefits[,] and that the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115).  However, "[t]he presence of a conflict of interest does not change the standard of review from deferential to *de novo*."  *Lopes v. First Unum Life Ins. Co.*, No. 09-CV-2642, 2011 WL 1239899, at *4 (E.D.N.Y. Mar. 30, 2011).  "Rather, a conflict of interest, like any relevant consideration, should act as a 'tiebreaker' when other considerations are closely balanced, particularly 'where circumstances suggest a high likelihood that it affected the benefits decision . . . .'"  *Id.* (quoting *Van Wright v. First Unum,* 740 F. Supp. 2d 397, 406 (S.D.N.Y. 2010)).

Consistent with its prior Order, this Court continues to assume the existence of a structural conflict of interest since it is undisputed that the Fund both evaluated claims for benefits and paid claims for benefits.  However, Plaintiff has failed to provide any evidence that this conflict of interest actually affected the Fund's determination denying Plaintiff's application for benefits.  As such, the allegations remain inherently speculative.  The only evidence Plaintiff can offer is that the Fund was in "critical status" in 2010 and "endangered status" in 2015.  Pl.'s SOMF ¶¶ 13-14.  These are the same assertions raised by Plaintiff in his motion to obtain discovery beyond the administrative record.  Even assuming that the Court could properly consider these facts – facts which are not part of the administrative record, *see* Def.'s 56.1(b) Response ¶ 14, and that do not fall within the limited post-appeal documents the Court has identified above – the Court finds them insufficient on their own to support Plaintiff's claim that the Fund's conflict affected its decision-making.

Examples of evidence a plaintiff may bring to bear to illustrate a conflict's improper influence on a claim administrator's decision-making include "a history of biased claims administration," *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008); an administrator's "deceptive or unreasonable conduct," *Durakovic*, 609 F.3d at 140 (citing *McCauley*, 551 F.3d at 138; and an administrator's taking "seemingly inconsistent positions [that] were [ ] financially advantageous."  *Glenn*, 554 U.S. at 118.  On the other hand, a structural conflict of interest "should prove less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances."  *Id.*, 554 U.S. at 117.  "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision."  *Durakovic*, 609 F.3d at 140 (quoting *Hobson,* 574 F.3d at 83).

36

Here, Plaintiff has not argued – at least not directly – that the Fund has failed to properly insulate its claims administrators from those employees managing the Fund's finances.  In any event, Plaintiff has provided no evidence to support such a claim.  Apart from failing to point to any structural vulnerabilities in the Fund's operations to support his claim that the Fund's conflict was influential, Plaintiff has provided no other evidence of the kind courts have credited as supporting a finding that decision-making was compromised by a conflict – prior biased claims administration, deceptive conduct, or inconsistent positions, etc.  Indeed, the Court finds the fact that the Committee engaged in post-appeal solicitation of information actually points in the other direction – that with respect to Plaintiff's claim, the Fund was operating as much like a neutral arbiter as a structurally conflicted plan administrator could.  Accordingly, the Court finds no indication that the Fund's financial status informed its determination of Plaintiff's claim.

### C.    Post-Appeal Correspondence

Plaintiff contends that "[t]he Fund's failure to investigate or clarify the disputed issue of whether Plaintiff performed work for J & S" is further evidence of arbitrary or capricious decision-making.  Pl.'s Mem. at 18.  The Court disagrees and views the post-appeal correspondence between Plaintiff's counsel and the Fund as supporting a finding that the Fund's actions were reasonable and not indicative of arbitrary or capricious decision-making.  "Under certain circumstances, it may be arbitrary and capricious for the administrator to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further.  Ultimately, however, '[t]he rule is one of reason,' and '[n]othing . . . requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case.'" *Roganti*, 786 F.3d at 213 (internal citations omitted) (quoting *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014)).

Here, the Fund engaged in several rounds of post-appeal correspondence with Plaintiff's attorney, which it seemingly was not required to do, and indicated its willingness to receive any additional information or evidence Plaintiff's counsel had to show that Plaintiff "was not an employee of a non-signatory company in the Sheet Metal Industry." PAC at 41. As the Fund observes, "[t]he short affidavit from Benkovsky is the only document Gosselin submitted after his appeal that even touched on his employment with J & S." Def.'s Opp'n. at 7. And that affidavit still failed to explain why Plaintiff was paid on the payroll of J & S rather than Triple S. *See* PAC at 53. Under these circumstances, the Court credits the Fund's argument that there was simply no additional evidence provided by Plaintiff which would justify reconsidering the Appeals Committee's determination. Similarly, the Fund's engagement with Plaintiff's counsel indicated its willingness to develop the record to the extent possible, and supports a finding that the Fund acted reasonably.

**D.    Consistency with other Appeals Determinations[9]**

Plaintiff points to three appeals he alleges are factually similar to his appeal and in which the Fund acted inconsistently, thus evidencing arbitrary and capricious decision-making. *See* Pl.'s Mem. at 21-23. The first appeal Plaintiff cites is that of individual SSN XXX-XX-1073. Plaintiff argues this appeal was granted by the Committee after it considered a letter from the president of a non-contributing employer explaining why certain payments were made through a non-contributing employer. *See id.* at 21-22. The Court has reviewed this Appeals Committee decision and finds significant factual differences between it and Plaintiff's appeal. Most notably,

---

[9]    The Court declines to consider certain admissions by other appellants regarding J & S, which the Fund states are "[r]elevant to the determination here, though not noted in the Appeals Committee's written decision." Def.'s Mem. at 17. The Court's inquiry here "is limited to the reasons given *at the time of the denial." Danouvong ex rel. Estate of Danouvong*, 659 F. Supp. 2d at 324 (internal quotation omitted) (emphasis added).

the correspondence submitted by the president of the non-contributing company, as quoted in the Committee decision, was much more thorough than Mr. Benkovsky's letter, and explained in detail the circumstances under which the appellant was paid. *See* DE 36-6 at 22. Additionally, the non-contributing employer "was started to be a graphic art and printing company" and did "not perform any work in the Sheet Metal Industry or any type of work that would be under the jurisdiction of the collective bargaining agreement." *Id.* This is a far cry from J & S Fabricators' intended purpose as stated in Mr. Benkovsky's initial correspondence, which was closely related to – if not actively involved in – the Sheet Metal Industry.

The second appeal Plaintiff points to is that of individual SSN XXX-XX-5105, in which, Plaintiff argues, the Committee discussed "the importance of [a] statement" by the appellant that some of his income was for bonuses and commissions. *See* Pl.'s Mem. at 22. Plaintiff argues that because the Committee directed Fund staff to confirm the validity of some of the appellant's representations, the Committee acted inconsistently with how it handled Plaintiff's appeal, in which, he argues, it relied solely on the SSA report. However, as the Fund points out, this appeal was different from Plaintiff's in that the dispute was over work performed for the same union company after receiving early retirement benefits, not work for a union company and a non-union company pre-retirement. Def.'s Opp'n. at 14. Also, the Committee did not credit the appellant's explanation as Plaintiff argues, but instead stated that "if [the appellant's] representations in response to his 2002 [SSA report] prove inaccurate . . . the Committee directed staff to withhold future benefits until the Fund has been fully reimbursed." DE 36-6 at 3.

The third appeal Plaintiff points to is that of individual SSN XXX-XX-4822, in which Plaintiff argues the Committee again sought out additional information, unlike Plaintiff's appeal. *See* Pl.'s Mem. at 22-23. The Fund argues that this appeal, like the others Plaintiff has cited,

instead shows the consistency with which the Committee relies on SSA reports to establish income in the absence of independently verifiable evidence to the contrary.  *See* Def.'s Opp'n. at 12.  The Court agrees.

Generally, the Court does not find that the Committee's decision in Plaintiff's appeal was inconsistent with its prior determinations in the appeals cited by Plaintiff so as to be arbitrary or capricious, or an abuse of discretion.  To the contrary, the Court observes in these appeals a general trend, with the first inquiry being one in which the Committee reviews SSA reports as the primary, yet rebuttable, source of evidence in establishing an individual's employment status.  Next, the Committee engages in a case-specific analysis to determine if it believes the presumption of the SSA reports can be rebutted, sometimes resulting in requests for additional information.  Significantly, not every appeals decision in which the Committee does not seek additional information, either from the Fund or from the appellant, is arbitrary or capricious.  Rather, absent clear error, the Court must defer to the Fund, acting through the Committee, in using its own limited resources to develop a factual record for each appeal as it sees fit.  The Court does not see clear error here, and finds that the Committee's handling of Plaintiff's appeal was not so inconsistent with other Appeals Committee decisions as to require judicial intervention.

## VI.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Spatt that Plaintiff's motion for summary judgment be DENIED and that the Fund's motion for summary judgment be GRANTED.

## VII.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See* FED. R. CIV. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Arthur D. Spatt and to the Chambers of the undersigned.  Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections**.

Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


                                                    **SO ORDERED.**

Dated: Central Islip, New York
      March 4, 2019

                                                    /s/ A. Kathleen Tomlinson
                                                    A. KATHLEEN TOMLINSON
                                                    U.S. Magistrate Judge